UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
MICHAEL ROBINSON

       Petitioner,               <u>MEMORANDUM AND ORDER</u>

   -against-                  Civil Action No.
                              CV-99-0256 (DGT)
DANIEL SENKOWSKI

       Respondent.

--------------------------------X


Trager, J:

    In this petition for habeas corpus relief pursuant to 18
U.S.C. § 2254 petitioner Michael Robinson ("Robinson") challenges
his New York State murder conviction.  In October 1999,
petitioner's application for the writ was denied; a certificate
of appealability was also denied.  Petitioner then petitioned the
Second Circuit (1) for a certificate of appealability and (2) to
expand the certificate of appealability to include a claim that
was found to be unexhausted.  The Second Circuit affirmed the
district court's judgment in part and remanded in part.

    Pursuant to the Second Circuit's order on remand,
petitioner's habeas petition was stayed to allow him the
opportunity to return to state courts to raise the unexhausted
claim.  Having now unsuccessfully raised this claim before the
state court pursuant to New York Criminal Procedure Law § 440.10,
petitioner once again seeks habeas relief before this court

asserting actual innocence and an alleged violation of his Sixth Amendment right to effective assistance of counsel. Specifically, petitioner asserts that trial counsel's failure to introduce a photograph of petitioner taken at the time of his arrest rises to the level of constitutional infirmity because it would have proved his innocence.  For the reasons that follow, this petition is denied.

**Background**

**(1)**

A jury tried and convicted Michael Robinson for the January 1993 murder of his estranged wife, Gwendolyn Samuels.  At the time of the murder, petitioner and Ms. Samuels had been separated for about a year, and Ms. Samuels was living with Jermaine Robinson, her then-current boyfriend with whom she was about to have a baby.

The murder took place at Ms. Samuels's place of employment, the home of eighty-eight-year old Alveina Marchon, in Bayside, Queens.  The factual recitation that follows is based on Ms. Marchon's testimony at trial, as she was the sole eyewitness to the murder.

A short time before Ms. Samuels death, a man arrived at Ms. Marchon's house, and Ms. Samuels introduced him to Ms. Marchon as

her husband Michael. (Tr. at 379.) Although petitioner had never come inside the house before, Ms. Marchon recognized him from the many previous times that she had seen him pick up Ms. Samuels from work, albeit from the distance between her house and the curb. (Tr. at 396.)

On the day of the murder, while Ms. Samuels cleaned, petitioner sat with Ms. Marchon in her living room. For approximately fifteen minutes before Ms. Samuels and petitioner left to run an errand, and again after they returned, petitioner watched television with Ms. Marchon. (Tr. at 379-80.) As they sat together in the living room, Ms. Marchon engaged petitioner in conversation. As Ms. Samuels had on a previous occasion told Ms. Marchon that petitioner was interested in becoming a police officer, Ms. Marchon asked him how long it would take to join the force. He responded: "about a year." (Tr. at 379.)

At around 2:30 p.m., Ms. Marchon watched petitioner follow Ms. Samuels upstairs. (Tr. at 380.) A few minutes later, responding to Ms. Samuels' screams, Ms. Marchon went upstairs to her bathroom, where she witnessed petitioner stabbing Ms. Samuels. (Tr. at 380-81.) Ms. Marchon approached petitioner and attempted to intercede to no avail; petitioner stabbed Ms. Samuels repeatedly until he fled the bathroom, stabbing Ms. Marchon on his way out. (Tr. at 381.)

By the time the police arrived to the house, Ms. Samuels had

died from multiple stab wounds to the back and neck. Ms. Marchon survived and identified Ms. Samuels' husband as the person who had stabbed both herself and Ms. Samuels. Upon Ms. Marchon's identification, the police proceeded to locate petitioner, executing a warrant for his arrest at his parents' house later that day.

**(2)**

Robinson was thereafter charged with two counts of Murder in the Second Degree (Penal Law §§ 125.25[1] and [2]); Attempted Murder in the Second Degree (Penal Law §§ 110/125.25[1]); four counts of Assault in the First Degree (Penal Law §§ 120.10[1], [2], [3], and [4]); Reckless Endangerment in the First Degree (Penal Law § 265.10[2]); and two counts of Criminal Possession of a Weapon in the Fourth Degree (Penal Law § 265.01[2]). All but the two counts of Murder in the Second Degree, Attempted Murder in the Second Degree and Assault in the First Degree (Penal Law § 120.10[2]) were dropped during trial on the People's motions.

Prior to trial, Ms. Marchon identified petitioner on two additional occasions: (1) in a photograph shown to her at the hospital two days after the crime and (2) in a line-up six months later. At the hospital immediately following the murder, Ms. Marchon also told Detective Whirter that Ms. Samuels' boyfriend/common law husband committed the murder; she told a doctor that Ms. Samuels' boyfriend committed the murder and told

4

someone else that a worker committed the murder.

The propriety of these identifications was the subject of a pretrial suppression hearing. During the hearing, petitioner's counsel argued that showing Ms. Marchon pictures of petitioner while she was in the hospital was unduly suggestive, particularly one photograph showing petitioner with Ms. Samuels.[1] In defense of its identification procedure, the People introduced into evidence the second photograph Ms. Marchon viewed in the hospital, a photograph of petitioner taken at the time of his arrest (hereinafter "arrest-photo"). The trial court denied defense counsel's motion to suppress the identification.

## (3)

In February 1994, petitioner went to trial in Queens Criminal Court. In addition to Ms. Marchon's eyewitness testimony described above, the prosecution introduced ten witnesses, including Jermaine Robinson, the decedent's boyfriend. Police officers testified not only about Ms. Marchon's condition immediately after the murder, but also about petitioner's behavior upon learning Ms. Samuels had been severely injured. When the police told him that Ms. Samuels had been hurt, petitioner refused to accompany police, absent an arrest warrant, to identify his wife. Reacting to the same information, his

---

[1] At the suppression hearing, the police officer testified that he covered the image of Ms. Samuels with his finger.

family disavowed knowledge of Ms. Samuels' relationship to petitioner. Initially, petitioner's father denied that Ms. Samuels was married to petitioner.

The defense attempted to establish a case of mistaken identity. Under the defense theory, Ms. Samuels' boyfriend Jermaine Robinson, not petitioner, had come to Ms. Marchon's house on the day of the murder. In addition to sharing the same last name, Jermaine and Michael Robinson are both tall, African-American men. According to the defense, on the day of the murder, Ms. Samuels identified the visitor as petitioner because she knew that although Ms. Marchon would not permit her boyfriend to be in her home, she would allow Ms. Samuels' husband to come inside. Defense counsel further argued that Jermaine Robinson had previously impersonated petitioner at Ms. Marchon's house for the same reason. In other words, Ms. Marchon correctly identified the man she thought was Ms. Samuels' husband.

At the same time, and somewhat inconsistently, the defense also sought to discredit Ms. Marchon's identification testimony. Defense counsel took particular issue with Ms. Marchon's age and ailing eyesight, which counsel argued had advanced to cataracts well before the time of trial. As part of this strategy, defense counsel asked Ms. Marchon whether petitioner had any facial hair on the day of the murder. Ms. Marchon replied: "I don't think he had. I don't think so." (Tr. at 401.)

To further establish petitioner's innocence, defense counsel relied on five alibi witnesses. Petitioner's mother Gertrude Robinson, his siblings Nathaniel, Lenny and Sheila Robinson and his sister's boyfriend Keith Caldwell, all testified that when the murder took place, petitioner was at his parents' house in Springfield Gardens, Queens.

Despite defense counsel's strong objection, petitioner's brother Nathaniel Robinson testified beyond his capacity as an alibi witness.[2] In narrative form on direct examination, he described his relationship with Ms. Samuels as one of a friend in whom she confided intimate information. For instance, he testified that she had told him that her boyfriend, whom she sometimes referred to as her "husband," was physically beating her. (Tr. at 602-03.) Moreover, Nathaniel Robinson testified that as her friend, he had previously picked up Ms. Samuels from work. In so doing, Nathaniel Robinson met Ms. Marchon. Significantly, he recalled the following details from this experience, which supported the defense theory of misidentification: (1) Ms. Marchon's driveway was set far back from the street, so far back that he could not identify Ms. Marchon on her front porch and (2) Ms. Marchon told him that she

_____

[2] Defense counsel not only advised petitioner and his family against Nathaniel Robinson's testimony, but handed up a sealed envelope to the court with a memo explaining why he opposed the testimony.

had never met petitioner, but she had met Ms. Samuels' boyfriend,
presumably Jermaine Robinson, who occasionally visited her house.
This latter point clearly contradicted the alternative theory
that bad eyesight had led to a misidentification because, if Ms.
Marchon had never met petitioner, it is difficult to believe that
she would not have identified Jermaine Robinson as the killer.
But Ms. Marchon never identified Jermaine Robinson; instead, on
at least three occasions prior to trial, she identified
petitioner.

(4)

On March 10, 1994, the jury convicted petitioner of Murder
in the Second Degree with respect to the murder of Gwendolyn
Samuels, but acquitted him of Attempted Murder in the Second
Degree and Assault in the First Degree with respect to Alveina
Marchon.  On April 6, 1994, the court sentenced Robinson to an
indeterminate term of imprisonment from twenty-five years to
life.

At sentencing, the trial court noted its thoughts on the
case.  First and foremost, the court criticized Nathaniel
Robinson's testimony, opining that the jury found the "bizarre"
testimony incredible.  (Sentencing Tr. at 18.)  According to the
trial court's observations during trial, the jury "sat there with
their mouths agape" as he testified.  Id.  The trial court
further highlighted petitioner's lack of remorse for his crime

8

and his family's attitude toward Ms. Samuels. Specifically, the trial court questioned petitioner's reluctance to help police in the absence of an arrest warrant, knowing that the police said his wife had been badly injured. (Sentencing Tr. at 17.) Likewise, the trial court critiqued the behavior exhibited by his alibi witnesses at that time. Id.

Petitioner unsuccessfully appealed and collaterally attacked his conviction in the state courts, each time alleging ineffective assistance of counsel based on various deficiencies of counsel. See People v. Robinson, 242 A.D.2d 745, 664 N.Y.S.2d 954 (2d Dept. 1997) (appeal affirming judgment of conviction); People v. Robinson, 91 N.Y.2d 896, 691 N.E.2d 1037 (1998) (denying application for leave to appeal). His post-conviction motions were denied on August 12, 1996 and March 1, 1999, respectively.

**(5)**

On January 13, 1999, petitioner filed a § 2254 petition based on an alleged violation of his Sixth Amendment right to effective assistance of counsel. Specifically, petitioner cited trial counsel's failure to call two additional and allegedly unbiased alibi witnesses to testify, as well as his allegedly inadequate cross-examination of Jermaine Robinson.

At oral argument before this court, petitioner's new counsel

raised an additional issue not presented in his petition for the writ: actual innocence. Defense counsel based petitioner's innocence claim on allegedly exculpatory evidence not presented at trial. According to petitioner, petitioner's arrest-photo, showing him with a beard and moustache contrary to Ms. Marchon's testimony as to his lack of facial hair, would prove his innocence.[3]

On October 13, 1999, petitioner's habeas relief was denied, holding that the state court's decision in his first post-judgment motion was not contrary to and did not involve an unreasonable application of clearly established Supreme Court precedent. With regard to petitioner's claim of actual innocence, this claim was "procedurally forfeited" and moreover, unavailing on the merits. In particular, I found that the record on this claim was not as compelling as petitioner asserted in light of the uncertainty the witness had expressed in her answer. Robinson v. Senkowski, No. 99-0256, slip op. (E.D.N.Y. October 13, 1999). Moreover, the circumstantial evidence indicating petitioner's guilt outweighed any alleged error in identification

---

[3] In his second § 440.10 motion in state court, as well as at oral argument before this court, petitioner also argued that Ms. Samuels' boyfriend Jermaine Robinson had been involved in the Central Park Jogger rape case. Although a Jermain Robinson was involved in that case, upon this court's order, the prosecution procured a picture of Jermain Robinson which patently proved to be a different person from the Jermaine Robinson in this case. Furthermore, Jermain Robinson lived in another county and was a different age than the Jermaine Robinson Ms. Samuels dated.

testimony.

Subsequent to the Second Circuit's remand, petitioner submitted a third § 440.10 motion to vacate conviction based exclusively on his arrest-photo claim.  Petitioner's motion was denied on both procedural and substantive grounds, holding that the claim was procedurally barred because it could have been raised in an earlier § 440.10 motion.  People v. Robinson, 5 Misc. 3d 1025(A), 799 N.Y.S.2d 163 (2d Dep't 2004).  In any event, the § 440.10 court found that trial counsel's failure to introduce petitioner's arrest-photo was based on legitimate trial strategy.  Id.  The Appellate Division, Second Department denied defendant's application for leave to appeal the judgment on November 29, 2004.

### Discussion

Asserting actual innocence, petitioner now bases his habeas petition on a single issue: trial counsel's failure to introduce petitioner's arrest photograph at trial.  For the reasons that follow, habeas relief is denied.

### (1)

A federal court has limited authority to grant the writ of habeas corpus to a prisoner convicted under state law.  Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (or

"AEDPA"), a federal court may grant the writ under two circumstances: where a state court's decision was adjudicated on the merits and either "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 18 U.S.C. § 2254(d).

A federal habeas court need not engage in even this limited degree of review when the state court decision rests on independent and adequate state procedural grounds. Coleman v. Thompson, 501 U.S. 722, 750 (1991). A habeas court is procedurally barred from review of such claims. This rule applies, as here, even where a state court reaches the merits of a petitioner's claim in the alternative. Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision) (emphasis in original).

The procedural default rule, however, is not without exception. Generally, a claim otherwise procedurally barred may be reviewed by a federal court in the event that a habeas petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court carved out an independent category of cases in which a miscarriage of justice may occur if the procedural bar does not yield to principles of justice: petitioners who allege that a "constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup, 513 U.S. at 327 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)); see also Doe v. Menefee, 391 F.3d 147 (2d Cir. 2004) (discussing the application of actual innocence in habeas cases).  Reconciling competing policies about finality and comity with individual justice, the Supreme Court isolated these claims as worthy of special protection, but imposed a much more exacting standard for failure to raise the claim earlier than the usual "cause and prejudice" regime requires.  Schlup, 513 U.S. at 327.

To establish the actual innocence threshold petitioners must satisfy two requirements.  Initially, petitioners must bolster their claim with "new reliable evidence" that was not produced during trial.  Id. at 324.  This evidence need not meet the admissibility requirements that govern at trial and it need not be viewed in isolation.  Id. at 327-28.  The reviewing court may examine this new evidence together with the record as a whole.  Id.  Ultimately, a petitioner must prove that in light of the new

13

evidence, "no reasonable juror would have found the petitioner

guilty beyond a reasonable doubt."  Id. at 327; see also id. at

333 (O'Connor, J., concurring) ("[A] petitioner does not pass

through the [innocence] gateway . . . if the district court

believes it more likely than not that there is any juror who,

acting reasonably, would have found the petitioner guilty beyond

a reasonable doubt.") (emphasis added; internal citation

omitted).  Only in this "extremely rare" case, may the habeas

court engage petitioner's claim on the merits.  Id. at 321-22.

## (2)

Michael Robinson defaulted the claim currently under review.

In its October 15, 2004 decision denying Robinson's third

§ 440.10 motion, the state court relied principally on New York

Criminal Procedure Law § 440.10(3)(c), which prohibits collateral

review of a claim that could have been raised in an earlier post-

conviction motion.  N.Y. Code Crim. Proc. § 440.10(3)(c)

(McKinney 2006).  People v. Robinson, 5 Misc. 3d 1025(A), 799

N.Y.S.2d 163 (Sup. Ct. Queens County 2004).  The failure to

comply with New York Criminal Procedure Law § 440.10 constitutes

an independent and adequate state ground.  McKethan v. Mantello,

292 F.3d 119, 123 (2d Cir. 2002).  Accordingly, petitioner's

claim is procedurally barred from review unless he can

demonstrate either cause and prejudice for the default or

alternatively, that the failure to consider the claim poses a

fundamental miscarriage of justice.

Asserting actual innocence, petitioner claims that the ineffectiveness of his trial counsel resulted in a fundamental miscarriage of justice. To support his contention of actual innocence, petitioner submits a single piece of evidence that was not presented at trial: petitioner's arrest-photo. Because the reliability of this photo is uncontested, the question remaining under Schlup, 513 U.S. at 327, is whether it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" had jurors seen this additional piece of evidence. As previously mentioned, petitioner contends that the photo is exculpatory to the extent that it challenges the identification testimony provided by the prosecution's only eyewitness, Ms. Marchon. Specifically, petitioner argues that the arrest-photo proves that this is a case of mistaken identity because while the picture clearly shows the petitioner with facial hair, Ms. Marchon described the perpetrator as clean-shaven both during the suppression hearing and again at trial.

First, petitioner's contention that this case rests on a single witness identification is a mischaracterization of the evidence. Aside from the identification testimony at issue, the circumstantial evidence presented at trial overwhelmingly pointed toward petitioner's guilt. Significantly, jurors heard testimony from Jermaine Robinson, the individual petitioner claimed to be

15

the real perpetrator.  Additionally, jurors heard the arresting

officers' testimony regarding petitioner's behavior upon learning

that his wife had been seriously injured - refusing to accompany

them to his injured wife without an arrest warrant - as well as

similar testimony from police officers casting doubt on the

credibility of petitioner's alibi witnesses.

Moreover, at trial the jurors witnessed first hand Ms.

Marchon's vision problems.  Despite this, jurors credited her

testimony which, as detailed above, was based on multiple

observations of petitioner from a close range on the day of the

murder: (1) Ms. Marchon sat with petitioner in her living room

and conversed with him on two occasions - the first for

approximately fifteen minutes - just prior to the murder and

(2) she witnessed him from close range as he stabbed Ms. Samuels

and then as he stabbed her.  Finally, jurors also heard Ms.

Marchon's answer to defense counsel's question about petitioner's

facial hair on cross-examination, which was not an absolute

denial, but an equivocal:  "I don't think he had.  I don't think

so."

A reasonable juror faced with this degree of circumstantial

evidence and eyewitness testimony would more likely than not have

found petitioner guilty beyond a reasonable doubt regardless of

the arrest photo.  Accordingly, petitioner's claim of actual

innocence is rejected.  His claim remains procedurally barred

unless he can demonstrate cause for the default and prejudice from a constitutional error.  See Coleman, 501 U.S. at 750.

To that end, petitioner argues that the procedural default should be excused because neither he nor his appellate counsel had possession of the arrest-photo until after this case reached the United States Court of Appeals for the Second Circuit. (Pet'r Br. at 17-18.)  He further argues that he was prejudiced by his trial counsel's constitutional deficiencies.  Id.  For the same reasons that petitioner's actual innocence claim fails, petitioner has not established that there exists "a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."  Strickland v. Washington, 466 U.S. 668, 695 (1984).  The evidence proving petitioner's guilt beyond a reasonable doubt would not have been upset by the addition of this singular piece of evidence.  The photograph is hardly the smoking gun that he insists it is. Petitioner's Sixth Amendment claim remains, therefore, procedurally barred from federal review.

In any event, assuming petitioner can overcome the procedural bar, he cannot prevail on the merits of his claim. The state court's opinion dated October 15, 2004 denying petitioner's third collateral attack on his conviction is neither "contrary to or an unreasonable application of clearly established federal law as determined by the United States

Supreme Court" nor based on an "unreasonable determination of the facts in light of the evidence presented."  18 U.S.C. § 2254(d). As Judge Katz cogently laid out in detail in the state court opinion, trial counsel's decision not to introduce the arrest-photo at trial reflected sound trial strategy.  See Robinson, 5 Misc. 3d 1025(A), 799 N.Y.S. 2d 163.

Judge Katz reasoned that the decision not to introduce the photograph was a strategic one as it afforded petitioner an advantage and avoided potentially "devastating" consequences. Id.  Had defense counsel introduced the arrest-photo at trial, the prosecution would have been able to offer in for rebuttal evidence that Ms. Marchon, the only eyewitness to the murder, identified petitioner's photograph days after the murder occurred.  Id.  Although a common procedure in federal court, under state law, identifications based on photographs are not addressed on direct examination.  At the same time, by not introducing the photograph, Judge Katz noted that petitioner was able to take advantage of Ms. Marchon's own admission that her eyesight had worsened since the time of the murder and argue that Ms. Marchon had misidentified petitioner in the line-up six months after the murder occurred.  Id.  Moreover, Judge Katz noted that "confronting [Ms. Marchon] with the arrest-photo would not have had the dramatic impact the defendant alleges it would have" because Ms. Marchon's testimony with regard to petitioner's

facial hair was consistently "equivocal" in contrast to her

unequivocal identification testimony.   <u>Id.</u>

## Conclusion

For the foregoing reasons, petitioner's petition for a writ of habeas corpus is denied without a hearing.  No certificate of appealability will be granted.  The Clerk of the Court is directed to enter judgment and close the case.


Dated:    Brooklyn, New York
          April 28, 2006


                                   SO ORDERED:


                                     /s/                    
                                   David G. Trager
                                   United States District Judge